NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 190822-U

NOS. 4-19-0822, 4-19-0823, 4-19-0824 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 15, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* J.B., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court |
|     Petitioner-Appellee, | ) | Macon County |
|     v. (No. 4-19-0822) | ) | No. 17JA65 |
| Destany B., | ) | |
|     Respondent-Appellant). | ) | |
| ------------------------------------------------------------------- | ) | |
| *In re* Je.C., a Minor | ) | No. 17JA66 |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v. (No. 4-19-0823) | ) | |
| Destany B., | ) | |
|     Respondent-Appellant). | ) | |
| ------------------------------------------------------------------- | ) | |
| *In re* Jee.C., a Minor | ) | No. 17JA67 |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v. (No. 4-19-0824) | ) | Honorable |
| Destany B., | ) | Thomas E. Little, |
|     Respondent-Appellant). | ) | Judge Presiding |

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  (1) The trial court did not err in finding respondent an unfit parent for failing to maintain a reasonable degree of responsibility as to her children's welfare.

        (2) The trial court did not err in terminating respondent's parental rights.

¶ 2    Respondent, Destany B., appeals the orders finding her an unfit parent and

terminating her parental rights to J.B. (born October 28, 2008), Je.C. (born December 14, 2014), and Jee.C. (born August 23, 2016). We affirm.

¶ 3                                    I. BACKGROUND

¶ 4            In April 2017, the State filed petitions alleging the children were neglected and abused. According to the petitions, the children were neglected in that they resided in an environment injurious to their welfare and were abused in that residing with respondent and Jason C., the putative father of Je.C. and Jee.C. and not a party to this appeal, created a substantial risk of physical injury. In support of both allegations, the petitions asserted respondent and Jason had substance abuse and domestic violence issues, respondent experienced mental health issues but was noncompliant with her treatment plan, and Jason was a registered sexual predator who was not compliant with counseling sessions. The putative father of J.B. is not a party to this appeal. In May 2017, the trial court found the children neglected.

¶ 5            In May 2019, the State petitioned for the termination of respondent's and the putative fathers' parental rights to the children. As to the issue of respondent's fitness to parent the children, the allegations were the same in the petition for each child. The State alleged respondent was an unfit parent in that she failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2018)); (2) make reasonable efforts to correct the conditions that were the basis of the children's removal (750 ILCS 50/1(D)(m)(i) (West 2018)); and (3) make reasonable progress toward the children's return during any nine-month period after the neglect adjudication, specifically the periods of May 11, 2017, to February 11, 2018, February 11 to November 11, 2018, and August 17, 2018, to May 17, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2018)).

¶ 6                In October 2019, the trial court held a hearing on the State's allegations of parental unfitness. At the hearing, the State's first witness was Shawna Spence, a case manager for Webster-Cantrell Hall (Webster-Cantrell).

¶ 7                Spence testified she received the case in April 2019. She was familiar with her predecessor's case notes and was aware of "what's been going on from the beginning." At the start of the case, it was recommended respondent undergo parenting, mental health, and substance abuse assessments, attend counseling, cooperate with services, and participate in drug screens. Respondent never had an overall satisfactory service plan. Respondent received a high score on the parenting assessment, so she was not required to take parenting classes. Respondent completed the mental health assessment but failed to comply with recommended services. Respondent completed the substance abuse assessment but did not follow through with treatment recommendations.

¶ 8                Spence testified respondent did not communicate with her but she would call the case aide. The same occurred with the previous case manager. At the last supervised visit, Spence told the case aide to give respondent her personal cell phone number and to tell respondent to call her at 8 a.m. the following morning. Respondent did not call.

¶ 9                Regarding counseling, respondent had been seeing a counselor, Dan Koenigs, but stopped. Respondent's participation in drug screens was "[v]ery [in]consistent." When Spence was first assigned to the case, she met with respondent on a Sunday to inform respondent she needed to go to Help at Home to complete the drug screens. Respondent informed Spence she did not have a ride. Spence told respondent "that was just an excuse because it was part of the service plan and it had to be done." Spence testified "maybe 80 to 100 drops" were scheduled

and it "could have been 60 that [were] missed." Some were negative, and some were positive. Respondent was prescribed psychotropic medication. At times the medication would show on the screen, but at other times it would not. This indicated respondent was not compliant with her medication. Some tests were positive for tetrahydrocannabinol (THC) and methamphetamine. At no point during the service plans was respondent consistent in completing the drug screens.

¶ 10 Regarding visits, in May 2019, visits were supervised at respondent's grandfather's home. The visits had to be returned to the agency as there were people at the grandfather's house who should not have been there. Respondent had not reached the point where she could have unsupervised overnight visits. Respondent was very good with her children. The visits went well. She attended those consistently.

¶ 11 Spence testified respondent did not have transportation issues. Spence stated that was just an excuse she used as respondent would drive her grandfather's car. If respondent could not drive, the grandfather made sure she had transportation. Spence felt no need to offer bus tokens or gas cards. Spence said the agency offered those to individuals who were "doing their services."

¶ 12 On cross-examination, Spence agreed the February 5, 2018, permanency report stated the following: "[Respondent] has completed her anger management at Heritage [Behavioral Health Center (Heritage)] and her individual therapy counseling. She has also completed her substance abuse counseling." Spence was not the case manager at the time. The certificates for those services were not in the records. Spence read the certificate handed to her by respondent's counsel, certifying respondent "successfully completed anger management therapy" at Heritage on October 27, 2017.

¶ 13            Spence was not aware respondent had been under the care of two physicians since she was recommended services. Spence read two letters from the physicians addressed to "To whom it may concern." A letter from Kevin Seungil Kim dated July 20, 2018, indicated Dr. Kim had been treating respondent for the past eight months for her chronic condition. Dr. Kim opined respondent was "in stable condition." The second letter, dated April 15, 2019, indicated respondent was under the care of "Dr. Lanker" since May 14, 2014, and was "stable on her medications."

¶ 14            Spence reiterated respondent was to participate in counseling services. Respondent's counsel handed a letter to Spence, dated April 16, 2019, from Koenigs. According to the letter, respondent had been seen by Koenigs since January 2019 for outpatient substance abuse counseling. The sessions were an hour long and occurred bimonthly. Topics for counseling included respondent's drug use, family stressors, and challenges related to the family case. The next scheduled appointment was April 17, 2019.

¶ 15            According to Spence, respondent was scheduled to participate in drug screens every Monday. Spence acknowledged she did not have exact numbers. Respondent resided in Monticello and Help at Home was in Decatur. No referrals were made to an organization that would assist with transportation.

¶ 16            Communication by respondent with the previous caseworker was an ongoing issue. Spence did not bring the notes from the last caseworker. The primary issue was a lack of communication regarding addresses and phone numbers. In April 2019, respondent did not have a working phone number for respondent. When asked if the issue had been resolved, Spence responded affirmatively, stating she guessed the number still worked. When asked the last time

she attempted to call respondent's number, Spence testified, "I haven't. I don't. I didn't."

¶ 17 Spence testified, since the filing of the termination petition, respondent was scheduled to visit her children once per month. Before the petition was filed, the visits occurred once each week. Spence was not aware the trial court had granted discretion to the agency for unsupervised visits in November 2017. The agency had not allowed respondent unsupervised visits with the children.

¶ 18 On cross-examination by the guardian *ad litem*, Spence testified she was not aware the trial court's order granting discretion for unsupervised visits was revoked in August 2018. Spence was aware the permanency report dated August 8, 2018, showed ongoing domestic violence issues between respondent and Jason. Jason secured, against respondent, an order of protection, which he later dropped. Some of the drug screens from May to July were positive for benzodiazepine, which was respondent's psychotropic medication. The July 6 test indicated respondent testified positive for benzodiazepine and opiates. Spence had no knowledge of whether respondent had been prescribed an opiate at that time. Spence had no reason to doubt the report respondent failed to appear for nine screens during that time period. Spence also had no reason to doubt the February 15, 2019, report showing respondent failed to appear for 19 out of 37 drug screens and the April 18, 2019, report indicating respondent failed to appear for the vast majority of her drug screens.

¶ 19 On redirect examination, Spence testified she was aware of the 2017 certificate of completion for substance abuse counseling. However, she agreed the use of drugs after 2017 showed she was not successful in meeting the substance abuse service requirement. Spence identified a list of the drug screens she completed or for which she failed to appear.

¶ 20        Jasmine Renfro, a case assistant at Webster-Cantrell, testified on behalf of the State. She supervised the visits between respondent and her children since September 2018. Respondent was "really good with the kids," providing their basic needs. Respondent attended every visit.

¶ 21        On cross-examination, Renfro testified during the visits at the grandfather's house, respondent was always preparing a meal. When the visits were moved to Webster-Cantrell, respondent brought food for the children. Appropriate activities were planned. Renfro had no safety concerns.

¶ 22        Respondent testified on her own behalf. The children were removed from her care by the Department of Children and Family Services (DCFS) in February 2017. At the very beginning of the case, respondent was asked to address anger management issues, participate in drug screens, and complete a mental health evaluation. Visits did not start for three to four weeks because the foster parent placement changed multiple times. When visits began, they occurred once a week for two hours. When the termination petition was filed, visits were reduced to one per month for two hours. The visits were initially at respondent's house. Then, community visits occurred. Then, the visits occurred at respondent's grandfather's house in Monticello. The visits were then moved to Webster-Cantrell. To prepare for the visits, respondent would cook, clean the house, and prepare something for the children to do.

¶ 23        According to respondent, she completed a 12-week anger management class in October 2017. Respondent completed an assessment for a parenting class. The score on the assessment was high, making participation in a parenting class unnecessary. Respondent participated in a mental health assessment in June 2017. It was recommended she participate in

anger management group sessions. Respondent did not recall being asked to participate in additional anger management treatment. In "probably" the beginning of 2019, respondent competed an assessment in Monticello. It was recommended she participate in substance abuse classes and counseling, "which we kind of mixed into one." When counsel asked if it was the beginning of the previous year or the current year, respondent testified: "I know there was one last year. I mean, they are right. I was off and on with it. There was a couple periods of time where I wasn't consistent with it; but I know I also seen him this year as well." This occurred at the Piatt County Mental Health Center. Respondent participated in outpatient substance abuse treatment and counseling bimonthly.

¶ 24        Respondent testified, around July 2019, she went for one week to The Pavilion for inpatient behavioral health treatment. Respondent moved back to Monticello in approximately April 2018. Since that time, Dr. Kim was her primary care physician. Before that, it was Dr. Lanker. Respondent was taking multiple medications, including Seroquel for sleep, clonazepam for anxiety, Suboxone to block her opioid receptors, and a benzodiazepine. Respondent had "been pretty much consistent with taking benzodiazepine." She had been prescribed opiates in "probably January" 2019 but was not then taking them because of the Suboxone.

¶ 25        Respondent testified she gave Renfro her cell number to give to Spence about a month before her testimony. When asked how long she did not have a phone, respondent testified she "wasn't really without a phone." Respondent testified the number changed when she moved to a contract plan. When asked how quickly she conveyed the new number to the caseworkers, respondent testified she texted Renfro, as she said, a day later. Her number had been the same before that.

¶ 26          Respondent stated she was consistent with telling caseworkers about her changes in address, except for a short time when she resided with Jason. Respondent held off telling them "because it was up in the air." Respondent testified she had not completed the drug screens due to transportation issues. The drug screens were out of town. Respondent's grandfather would take her when he wasn't working. Since around six months before her testimony (approximately April 2019), when her grandfather got a full-time job, he was not able to take her everywhere she needed to go. Respondent did not ask for help with transportation. Her first caseworker, "Troy," provided bus tickets and gas cards, but the newer caseworkers did not.

¶ 27          On cross-examination, respondent testified on December 4, 2018, she was residing with Jason when the two got into a fight. Respondent testified she provided the documentation, including the certificates, to "Ms. Holly," the previous caseworker. Ms. Holly lost the documents. Webster-Cantrell lost respondent's entire file three times.

¶ 28          Regarding her living situation, respondent testified she resided with Jason in Decatur from November to December 2018. Before that time period, respondent resided with her grandfather in Monticello from May to November 2018. Before May 2018, respondent resided "[o]ff and on" with Jason or her grandparents. When DCFS became involved in approximately March 2017, the children resided with respondent and Jason in their own house.

¶ 29          Respondent testified she was not working. Respondent had taken approximately a monthlong break from Dairy Queen in Monticello to get her medications adjusted. She had worked at Dairy Queen in Monticello for three months. Before that, she worked there intermittently for approximately five years. When she moved back to Monticello in 2017, she worked at Hardee's for around a year. She continued to work at the Monticello Hardee's while

residing with Jason in Decatur. When asked why she did not show for drug screens, respondent said "[h]onestly, a ride was a big issue." She did not have a reason for missing the drug screens while she resided in Decatur from March 2017 to November 2017. When asked if she told anyone about her transportation issues, respondent testified she told Ms. Holly, who said she would get back to her, but Ms. Holly did not. Respondent reported telling workers at Webster-Cantrell "a couple times" about her difficulties but they did not respond. It was difficult for her when they did not respond.

¶ 30　　　　On cross-examination by the guardian *ad litem*, respondent testified she was prescribed Suboxone the week before her testimony. Respondent had been prescribed a benzodiazepine for probably over a year. Respondent was to take the medication three times each day to treat anxiety and panic attacks. Respondent agreed benzodiazepines would be in her system if she performed her drug drops.

¶ 31　　　　On redirect examination, respondent testified, regarding the drug screens, there was a misunderstanding at the beginning of the case over the number of screens she was to participate in. Weekly drug screens began with the caseworker who replaced Troy. In 2016 and 2017, there were seven drug screens referred. Respondent participated in four of them. After that time, respondent was not residing in Decatur.

¶ 32　　　　At the conclusion of the evidence, the guardian *ad litem* asked the court to take judicial notice of the drug screens attached to the February 15, 2019, permanency report. According to the report, respondent failed to appear for 19 out of 37 drug screens between July 6, 2018, and February 8, 2019. Eight tests were positive for opiates, including one in July 2018 and one in January 2019. The results for four were "adulterated." Six tested positive for

benzodiazepines, for which respondent had a prescription.

¶ 33    The trial court stated its findings. The court concluded Spence was credible. The court observed Spence testified respondent never had an overall satisfactory rating on her service plans, respondent missed more drug screens than she attended, some drug screens were positive for THC and methamphetamine, and respondent had attended all visits. Regarding respondent, the court found her testimony regarding transportation and drug issues not credible. The court commended respondent for her record in visiting her children and parenting appropriately during those sessions. The court, however, found the drug issue was the overriding concern and ruled the State proved its allegations of unfitness by clear and convincing evidence.

¶ 34    The best-interests hearing was held in November 2019. At the hearing, Spence and respondent testified. The State also asked the trial court to take notice of the best-interest report.

¶ 35    According to Spence, the children had been placed in a traditional foster home for three years. They had not, to her knowledge, been in other foster homes. The children were placed together, and no other children lived in the home. The children were enrolled in school and were doing "great." The children had no special medical, cognitive, or developmental needs and required no special treatment or therapy. The foster parents were an "adoptive resource." The children were "[v]ery" bonded with the foster parents. Spence believed adoption would be the least disruptive way to move forward in the case.

¶ 36    On cross-examination, Spence testified J.B. was 12 years old and was removed from his mother at 9 years of age. When asked how she knew the foster parents would be able to care for the children, Spence testified she visited the foster parents' home monthly. Each time

- 11 -

she visited, the home was clean, and the children were clean, and there was "always *** an abundance of food and clothing for every season." The children called their foster parents "mom and dad." Spence did not believe returning the children to respondent was appropriate as she had not complied with services and her medication. The children had stability with the foster parents. They had a roof over their heads, and they were loved.

¶ 37 Respondent testified the case had been open since the end of March 2017. The children did not go to the foster home first. Initially, the children were placed with respondent's family. They stayed with respondent's father for two to three months and then with her grandfather for about one month. DCFS moved the children to the traditional foster home after anonymous calls and "a bunch of drama." The children were moved "to avoid disrupting them." The children had been with the foster parents for approximately two years. The children knew respondent as "mom." Respondent testified she could provide her children food and clothing. She worked full-time at Dairy Queen and received medical assistance and a Link card from the State. The children were very close to her family. J.B., who was 11, said he liked it where he was, but he wanted to be with his family. Respondent lived with her grandfather in a three-bedroom house, where the children were born and raised. The children had bedrooms there. They had plenty of toys. She had a good support system. Her grandfather, father, and her father's fiancée were very supportive and would help.

¶ 38 According to respondent, the younger two children cried at the end of visits. When respondent had visits with the children, she brought food and toys to play with outside. The younger two children called the foster mom, "mommy," but J.B. called her by her name.

¶ 39 The best-interest report was prepared by Spence. It contains one paragraph of

analysis, stating the following in its entirety:

"On October 11, 2019, [respondent] was found to be unfit by the Macon County Courts. At this point, her overall goal continues to rate unsatisfactory. When looking at permanency, this worker is not able to recommend return home to [respondent]. [The children are] in need of stability and consistency. It needs to be assured that [the children are] able to be protected in any situation. At this time, [respondent] has continued to show that she would not be able to protect [the children] and would not put their needs first. [The children are] currently placed in a licensed traditional foster care home. [The children have] a sense of security with their foster parents ***. [The foster parents are] going to ensure that [the children are] protected and able to set ground rules for [the children's] biological mother. [The children have] other family that they are surrounded by that not only gives them support but gives the foster parents support as well. [The children are] very comfortable with their foster parents and have developed a strong bond and attachment to the foster parents as well. [The children have] seen a lot for their young age and deserve[ ] the right to have normalcy."

¶ 40　　　　At the conclusion of the best-interests hearing, the trial court cited the factors it must consider in making its ruling, those in section 1-3(4.05) of the Juvenile Court Act of 1987

- 13 -

(Act) (705 ILCS 405/1-3(4.05) (West 2018)). The court observed the factors most pertinent to this case included the children's sense of security and familiarity, continuity of affection for the children, and the children's need for permanence and stability. The court observed the children were bonded with their foster parents, having spent two or three years with them, and were placed together. The court found credible Spence's conclusion it was best for the children to remain with their foster parents. The court noted the bond between respondent and her children, but the court believed the need for stability, continuity, and permanence required the children remain with their foster parents. The court found termination of respondent's parental rights to be in the children's best interests.

¶ 41        This appeal followed.

¶ 42                            II. ANALYSIS

¶ 43                            A. Parental Fitness

¶ 44        Respondent contends the trial court erred in finding her to be an unfit parent to her children. Respondent first argues the finding she failed to show a reasonable degree of interest, concern, or responsibility as to her children's welfare is against the manifest weight of the evidence. Respondent emphasizes the need not to complete parenting services, her completion of anger management services, individual therapy, and substance abuse counseling, and her visits with her children. Respondent further maintains her failure to participate in drug screens should not be considered against her as she had transportation issues and Spence refused to help her due to respondent's failure to participate in services. Respondent maintains that refusal to provide transportation was problematic as she could not participate in services due to having no transportation.

¶ 45        Parental unfitness will be found if the State proves, by clear and convincing evidence, one ground listed in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)). *In re A.L.*, 409 Ill. App. 3d 492, 500, 949 N.E.2d 1123, 1129 (2011). A finding of parental unfitness is entitled to great deference as the trial court viewed witness testimony and observed witness's demeanor. *Id.* We will not disturb a trial court's parental unfitness finding unless the finding is against the manifest weight of the evidence. *In re T.A.*, 359 Ill. App. 3d 953, 960, 835 N.E.2d 908, 913 (2005). A finding is against the manifest weight of the evidence only when "the correctness of the opposite conclusion is clearly evident." *Id.*

¶ 46        In this case, one basis on which the trial court found respondent unfit was respondent's failure to maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2018)). The failure to show interest, to show concern, and to show responsibility are three separate grounds for parental unfitness. *In re Richard H.*, 376 Ill. App. 3d 162, 166, 875 N.E.2d 1198, 1202 (2007).

¶ 47        To find a parent unfit for failing to maintain a reasonable degree of responsibility in her children's welfare, the trial court must examine that parent's behavior regarding the children in the context and circumstances in which the conduct occurred. *Id.* That the parent demonstrates some affection or responsibility is insufficient; the parent must demonstrate objectively reasonable responsibility for her children's welfare. *In re B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35, 999 N.E.2d 817. The parent's efforts to maintain parental responsibilities should be considered rather than the parent's successes. *In re Adoption of C.A.P.*, 373 Ill. App. 3d 423, 428, 869 N.E.2d 214, 219 (2007). Circumstances, including difficulty in obtaining transportation, are relevant to this consideration. *B'Yata I.*, 2013 IL App (2d) 130558, ¶ 35.

- 15 -

¶ 48     We find no error in the trial court's decision respondent failed to maintain a reasonable degree of responsibility toward her children's welfare. Respondent's substance abuse issues and her mental health issues served as the bases for her children's removal from her home. Respondent, however, failed to take reasonable responsibility in addressing those issues. Respondent missed a substantial number of drug screens. While she asserted transportation from her home in Monticello to testing in Decatur was an issue and the agency failed to assist her with the transportation problems, the trial court did not believe her. This credibility determination is supported by the record. In the same period when respondent was missing drug screens, she attended every visit with her children. In addition, in the early period of DCFS involvement, when respondent resided in Decatur where the testing occurred, respondent missed drug screens. Aside from the missed screens, the screens she completed demonstrated use of opiates and other substances as well as respondent's failure to be consistent in taking her medication, benzodiazepine. Respondent further admitted her mental health treatment through counseling was inconsistent.

¶ 49     Because we have found no error in the finding respondent was unfit on this ground, we need not consider the remaining grounds. Only one statutory ground of parental unfitness need be proved. See *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006).

¶ 50                    B. The Best Interests of the Children

¶ 51     Respondent contends the trial court's decision to terminate her parental rights is against the manifest weight of the evidence. Respondent contends it is in her children's best interests to be raised by their mother who loved and fought for them. Respondent emphasizes her

strong family support and her children's bond to their family. Respondent further emphasizes the children had rooms ready and she was employed.

¶ 52       After a finding of parental unfitness, a hearing on the children's best interests will be held. At this hearing, the focus of the trial court shifts to the child's interest in securing "a stable, loving home life." *In re D.T.*, 212 Ill. 2d 347, 364, 818 N.E.2d 1214, 1227 (2004). When considering a child's best interests, the court must consider the factors listed in section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2018)). These factors include the child's physical safety and welfare, the development of the child's identity, the child's background and family ties, the child's sense of attachments including the sense of security and familiarity, the uniqueness of each child and family, and the preferences of those available to care for the child. *Id.* The parent's desire to have a continued relationship with her child yields to the child's interests. *D.T.*, 212 Ill. 2d at 364.

¶ 53       Parental rights may be terminated only if the trial court finds the State proved, by a preponderance of the evidence, the termination is in the child's best interest. *In re Jay H.*, 395 Ill. App. 3d 1063, 1071, 918 N.E.2d 284, 290-91 (2009). We will not overturn a determination as to a child's best interest unless it is against the manifest weight of the evidence. *Id.*

¶ 54       The trial court's decision to terminate respondent's parental rights is not against the manifest weight of the evidence. At the conclusion of the best-interests hearing, the trial court considered the statutory factors found in  section 1-3(4.05) of the Act (705 ILCS 405/1-3(4.05) (West 2018)). The court found the factors most relevant to the case to be the children's sense of security and familiarity, continuity of affection for the children, and the children's need for permanence and stability. The children were together in the same foster home where they had

resided for over two years. The children were bonded to the foster parents, whom the children called "mom and dad" and who were an "adoptive resource." There, the children were properly fed and clothed. In contrast, stability and permanence could not be provided by respondent. Despite over two and a half years of DCFS involvement, respondent's substance abuse issues remained. There is no error.

¶ 55                                     III. CONCLUSION

¶ 56          We affirm the trial court's judgment.

¶ 57          Affirmed.